# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

EXPRESS SCRIPTS, INC.; EVERNORTH HEALTH, INC.; ASCENT HEALTH SERVICES LLC; MEDCO HEALTH SERVICES, INC.; CAREMARK RX, L.L.C.; ZINC HEALTH SERVICES, LLC; OPTUMRX, INC.; OPTUMRX HOLDINGS, LLC; EMISAR PHARMA SERVICES LLC,

*Plaintiffs-Appellants*,

v.

FEDERAL TRADE COMMISSION; ANDREW N. FERGUSON *in his official capacity as Commissioner and Chair of the United States Federal Trade Commission*; REBECCA KELLY SLAUGHTER *in her official capacity as Commissioner of the United States Federal Trade Commission*; ALVARO M. BEDOYA *in his official capacity as Commissioner of the United States Federal Trade Commission*; D. MICHAEL CHAPPELL *in his official capacity as Federal Trade Commission Chief Administrative Law Judge*,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Eastern District of Missouri, No. 4:24-cv-01549-MTS, Honorable Matthew T. Schelp

## APPELLANTS' OPENING BRIEF

ENU MAINIGI
CRAIG D. SINGER
STEVEN M. PYSER
CHARLES L. MCCLOUD
PATRICK DEVER
CHRISTOPHER BALDACCI
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, D.C. 20024
(202) 434-5000

*Counsel for Caremark Rx, L.L.C. and Zinc Health Services, LLC*

DANIEL S. VOLCHOK
JENNIFER MILICI
PERRY A. LANGE
KEVIN M. LAMB
JOHN W. O'TOOLE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
daniel.volchok@wilmerhale.com

*Counsel for Express Scripts, Inc.; Evernorth Health, Inc.; Ascent Health Services LLC; and Medco Health Services, Inc.*

April 15, 2025

Additional Counsel on Inside Cover

STEVEN A. ENGEL
MICHAEL COWIE
RANI HABASH
DECHERT LLP
1900 K Street N.W.
Washington, D.C.  20006
(202) 261-3481

*Counsel for Caremark Rx, L.L.C.
and Zinc Health Services, LLC*

MATTHEW S. ROZEN
GIBSON, DUNN & CRUTCHER LLP
1700 M Street N.W.
Washington, D.C.  20036
(202) 955-8500

THEODORE J. BOUTROUS JR.
SAMUEL LIVERSIDGE
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7420

*Counsel for OptumRx, Inc.;
OptumRx Holdings, LLC; and
Emisar Pharma Services LLC*

KYLE T. EDWARDS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA  94111
(628) 235-1000

CHARLES F. RULE
DANIEL J. HOWLEY
DEREK W. MOORE
RULE GARZA HOWLEY LLP
901 Seventh Street N.W.
Suite 600
Washington, D.C.  20001
(202) 843-9280

*Counsel for Express Scripts, Inc.;
Evernorth Health, Inc.; Ascent Health
Services LLC; and Medco Health
Services, Inc.*

# SUMMARY OF THE CASE

Plaintiffs are three pharmacy-benefit managers who seek relief from an administrative proceeding brought by the Federal Trade Commission ("FTC"). That proceeding—an in-house adjudication overseen by the commission's own administrative law judge ("ALJ")—is unconstitutional for three separate reasons. First, contrary to Article II, both the ALJ and the commissioners are insulated from presidential accountability, because by statute they may be removed only for cause. Second, contrary to Article III, the FTC seeks to adjudicate plaintiffs' private rights (and invalidate thousands of plaintiffs' contracts) outside Article III courts, where adjudication of those rights and remedies belongs. And third, contrary to the Fifth Amendment's Due Process Clause, the FTC's in-house proceedings put the agency in the role of investigator, prosecutor, and judge, resulting in a striking decades-long winning streak for the agency—one starkly different from the FTC's record before neutral Article III arbiters.

Despite these constitutional problems, and the irreparable harm plaintiffs are suffering by being subjected to this unconstitutional proceeding, the district court denied plaintiffs' motion for a preliminary injunction. This Court should reverse. Given the significance of the constitutional issues at stake, plaintiffs submit that oral argument would assist in the Court's resolution of this appeal and that 20 minutes of argument time per side would be appropriate.

i

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and this Court's Rule 26.1A, appellants Express Scripts, Inc.; Evernorth Health, Inc.; Ascent Health Services LLC; and Medco Health Services, Inc. state as follows:

1. Express Scripts, Inc. ("Express Scripts") is a wholly owned subsidiary of Evernorth Health, Inc. ("Evernorth"), which is a wholly owned subsidiary of The Cigna Group, a publicly held corporation. No other publicly held corporation owns 10% or more of Express Scripts's stock.

2. Evernorth is a wholly owned subsidiary of The Cigna Group. No other publicly held corporation owns 10% or more of Evernorth's stock.

3. Ascent Health Services LLC ("Ascent") is co-owned by The Cigna Group through wholly owned subsidiaries as an LLC Member. Ascent is a limited liability company and does not issue stock. No other publicly held corporation is a co-owner with a 10% or greater interest in Ascent.

4. Medco Health Services, Inc. ("Medco") is a wholly owned subsidiary of Evernorth, which is a wholly owned subsidiary of The Cigna Group. No other publicly held corporation owns 10% or more of Medco's stock.

Appellate Case: 25-1383    Page: 4    Date Filed: 04/16/2025 Entry ID: 5506938

Pursuant to Federal Rule of Appellate Procedure 26.1 and this Court's Rule 26.1A, appellants Caremark Rx, L.L.C. and Zinc Health Services, LLC state as follows:

1. Caremark Rx, L.L.C. is a limited liability company, not a "nongovernmental corporate party" for purposes of Rule 26.1. Rule 26.1 therefore does not require any disclosure with respect to it. Caremark Rx, L.L.C. is a wholly owned direct subsidiary of CVS Pharmacy, Inc. CVS Pharmacy, Inc. is not publicly held. CVS Pharmacy, Inc. is a wholly owned direct subsidiary of CVS Health Corporation, which is publicly held.

2. Zinc Health Services, LLC is a limited liability company, not a "nongovernmental corporate party" for purposes of Rule 26.1. Rule 26.1 therefore does not require any disclosure with respect to it. Zinc Health Services, LLC is a direct subsidiary of Zinc Health Ventures, LLC, and of Cardinal Health 110, LLC. Neither Zinc Health Ventures, LLC nor Cardinal Health 110, LLC is publicly held. Zinc Health Ventures, LLC is a wholly owned indirect subsidiary of CVS Health Corporation, which is publicly held. Cardinal Health 110, LLC is a wholly owned subsidiary of Cardinal Health, Inc., which is publicly held.

Appellate Case: 25-1383   Page: 5   Date Filed: 04/16/2025 Entry ID: 5506938

Pursuant to Federal Rule of Appellate Procedure 26.1 and this Court's Rule 26.1A, appellants OptumRx Holdings, LLC; OptumRx, Inc.; and Emisar Pharma Services LLC state as follows:

1. The ultimate parent company of OptumRx Holdings, LLC is UnitedHealth Group Incorporated, a publicly traded company. Other intermediate parent companies include United HealthCare Services, Inc. and Optum, Inc.

2. The ultimate parent company of OptumRx, Inc. is UnitedHealth Group Incorporated, a publicly traded company. Other intermediate parent companies include OptumRx Holdings, LLC; United HealthCare Services, Inc.; and Optum, Inc.

3. The ultimate parent company of Emisar Pharma Services LLC is UnitedHealth Group Incorporated, a publicly traded company. Other intermediate parent companies include United HealthCare Services, Inc.; Optum Pharma Services Holdings, Inc.; and Optum, Inc.

4. No other publicly traded corporation is known to own 10% or more of the stock of OptumRx Holdings, LLC; OptumRx, Inc.; or Emisar Pharma Services LLC.

Appellate Case: 25-1383    Page: 6    Date Filed: 04/16/2025 Entry ID: 5506938

# TABLE OF CONTENTS

SUMMARY OF THE CASE ...................................................................... i

CORPORATE DISCLOSURE STATEMENT ...................................... ii

TABLE OF AUTHORITIES ............................................................... vii

INTRODUCTION ................................................................................1

JURISDICTION...................................................................................2

STATEMENT OF ISSUES ..................................................................3

STATEMENT OF THE CASE...............................................................3

    A.    Statutory Background....................................................................3

    B.    Factual And Procedural Background ..................................5

SUMMARY OF ARGUMENT ...........................................................11

STANDARD OF REVIEW .................................................................18

ARGUMENT .....................................................................................18

I.    THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFFS ARE
NOT LIKELY TO SUCCEED ON THE MERITS ...................................18

    A.    The FTC's Structure Violates Article II..............................19

        1.    FTC Commissioners ............................................20

        2.    FTC ALJs...............................................................26

        3.    No Heightened Prejudice Showing Is Required ......................32

    B.    The FTC's In-House Adjudication Of Private Rights Violates
Article III..............................................................................33

    C.    The FTC's In-House Adjudication Violates Due Process .................42

II.    THE DISTRICT COURT ERRED IN CONCLUDING PLAINTIFFS HAVE NOT
SHOWN SUFFICIENTLY GREAT IRREPARABLE HARM WARRANTING
PRELIMINARY RELIEF ......................................................................46

Appellate Case: 25-1383    Page: 7    Date Filed: 04/16/2025 Entry ID: 5506938

III.  THE DISTRICT COURT ERRED IN CONCLUDING THAT THE BALANCE OF
EQUITIES AND PUBLIC INTEREST DISFAVOR PRELIMINARY RELIEF ............... 51

CONCLUSION ........................................................................................................ 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

Appellate Case: 25-1383     Page: 8     Date Filed: 04/16/2025 Entry ID: 5506938

# TABLE OF AUTHORITIES

## CASES

Page(s)

*A.L.A. Schechter Poultry Corporation v. United States*, 295 U.S. 495 (1935)............................................................................................37

*ABM Industry Groups, LLC v. DOL*, 2024 WL 4642962 (S.D. Tex. Oct. 30, 2024) ......................................................................................31

*AMG Capital Management, LLC v. FTC*, 593 U.S. 67 (2021)....................................4

*Arkansas Wholesale Grocers' Association v. FTC*, 18 F.2d 866 (8th Cir. 1927)..............................................................................10, 41, 42, 45

*Atlantic Delaine Company v. James*, 94 U.S. 207 (1877) ......................................40

*Aunt Bertha v. NLRB*, 2024 WL 4202383 (N.D. Tex. Sept. 16, 2024) ..................33

*Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023) ........................................*passim*

*Axon Enterprise, Inc. v. FTC*, 986 F.3d 1173 (9th Cir. 2021)..........................16, 43

*Bond v. United States*, 564 U.S. 211 (2011) ..........................................................49

*Butler v. Pennsylvania*, 51 U.S. 402 (1850) ..........................................................38

*Calder v. Bull*, 3 U.S. 386 (1798) ..........................................................................38

*Caperton v. A.T. Massey Coal Company*, 556 U.S. 868 (2009)..............................42

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020)....................................................52

*Chamber of Commerce of Minneapolis v. FTC*, 280 F. 45 (8th Cir. 1922)................................................................................................44, 45

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)..................................................................................................48, 49

*Cigna Corporation v. Bricker*, 103 F.4th 1336 (8th Cir. 2024) ................18, 49, 50

*Collins v. Yellen*, 594 U.S. 220 (2021) ..........................................13, 20, 21, 32, 33

*Crowell v. Benson*, 285 U.S. 22 (1932) ..................................................................41

Appellate Case: 25-1383    Page: 9    Date Filed: 04/16/2025 Entry ID: 5506938

*Delaware State Sportsmen's Association, Inc. v. Delaware Department of Safety & Homeland Security*, 108 F.4th 194 (3d Cir. 2024)..................................................................................49

*Firearms Regulatory Accountability Coalition, Inc. v. Garland*, 112 F.4th 507 (8th Cir. 2024)........................................................32

*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 483 (2010) .................................. 3, 13, 19, 20, 26, 28, 29, 30

*FTC v. Meta Platforms, Inc.*, 654 F.Supp.3d 892 (N.D. Cal. 2023)........................43

*FTC v. Microsoft Corporation*, 2023 WL 4443412 (N.D. Cal. July 10, 2023) ..................................................................................43

*FTC v. Sperry & Hutchinson Company*, 405 U.S. 233 (1972)..........................38, 39

*FTC v. Tempur Sealy International, Inc.*, 2025 WL 617735 (S.D. Tex. Feb. 26, 2025)..................................................................................44

*FTC v. U.S. Anesthesia Partners Inc.*, 2024 WL 2137649 (S.D. Tex. May 13, 2024)..................................................................................44

*Globe Cotton Mills v. NLRB*, 103 F.2d 91 (5th Cir. 1939)......................................40

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989)..............................34, 36, 38

*Grasso Enterprises, LLC v. Express Scripts, Inc.*, 809 F.3d 1033 (8th Cir. 2016)..................................................................................46

*H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939 (8th Cir. 2023) ................................50

*H&R Block Inc. v. Himes*, 2024 WL 3742310 (W.D. Mo. Aug. 1, 2024)..................................................................................32, 33

*Harris v. Bessent*, 2025 WL 980278 (D.C. Cir. Mar. 28, 2025), ..........22, 23, 24, 25

*Harris v. Bessent*, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025),......................22, 24

*Heideman v. South Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) ......................50

*Holloway v. Bristol-Meyers Corporation*, 485 F.2d 986 (D.C. Cir. 1973)..................................................................................38

*Home Instead, Inc. v. Florance*, 721 F.3d 494 (8th Cir. 2013) ..............................18

Appellate Case: 25-1383     Page: 10     Date Filed: 04/16/2025 Entry ID: 5506938

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ......................9, 22, 23

*In re H&R Block, Inc.*, 2024 WL 4544208 (F.T.C. Oct. 18, 2024)..................30, 31

*In re Miller*, 454 F.3d 899 (8th Cir. 2006)................................................26

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022) .........................................9, 29, 30, 31

*LabMD, Inc. v. FTC*, 894 F.3d 1221 (11th Cir. 2018)..............................28

*Leachco, Inc., v. Consumer Product Safety Commission*,
  103 F.4th 748 (10th Cir. 2024)......................................................50

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016).........................51

*Lewis v. Woods*, 848 F.2d 649 (5th Cir. 1988) .......................................52

*Lucia v. SEC*, 585 U.S. 237 (2018)...............................................26, 27, 30

*Morehouse Enterprises, LLC v. ATF*, 78 F.4th 1011 (8th Cir. 2023)....17, 46, 47, 48

*Morrison v. Olson*, 487 U.S. 654 (1988) ..............................................30

*Murray's Lessee v. Hoboken Land & Improvement Company*,
  59 U.S. 272 (1856)...............................................................34, 35, 40

*Myers v. United States*, 272 U.S. 52 (1926) ..........................................21

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................18

*NLRB v. Bell Aerospace Company*, 416 U.S. 267 (1974) ........................................28

*NLRB v. Colten*, 105 F.2d 179 (6th Cir. 1939)........................................40

*NLRB v. William Tehel Bottling Company*, 129 F.2d 250 (8th Cir.
  1942)............................................................................40

*PHH Corporation v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018)) ....................................25

*Powell v. Ryan*, 855 F.3d 899 (8th Cir. 2017) .......................................46

*Sears, Roebuck & Company v. FTC*, 258 F. 307 (7th Cir. 1919)...........................38

*SEC v. Jarkesy*, 603 U.S. 109 (2024)...............................................*passim*

*Seila Law LLC v. CFPB*, 591 U.S. 197 (2020)...............................................*passim*

Appellate Case: 25-1383     Page: 11     Date Filed: 04/16/2025 Entry ID: 5506938

*Seton v. NLRB*, 2024 WL 4678057 (W.D. Tex. Oct. 18, 2024) ..............................33

*Stern v. Marshall*, 564 U.S. 462 (2011) .....................................................................34

*Trump v. Wilcox*, 2025 WL 1063917 (U.S. Apr. 9, 2025)................................22, 24

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) ......................................................29

*United States v. Cavanaugh*, 643 F.3d 592 (8th Cir. 2011)......................................25

*United States v. Iowa*, 126 F.4th 1334 (8th Cir. 2025)......................................49, 50

*United States v. Perkins*, 116 U.S. 483 (1886) ..........................................................30

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994) ...................................................51

*Williams v. Pennsylvania*, 579 U.S. 1 (2016) ............................................................42

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .................18

*Withrow v. Larkin*, 421 U.S. 35 (1975) .......................................................10, 16, 44

*YAPP USA Automobile Systems, Inc. v. NLRB*, 2024 WL 4489598
(6th Cir. Oct. 13, 2024)..........................................................................................50

## DOCKETED CASES

*Axon Enterprise, Inc. v. FTC*, No. 20-15662 (9th Cir.)......................................47, 48

*H&R Block, Inc. v. Himes*, No. 24-2626 (8th Cir.)....................................................31

*In re Caremark Rx, L.L.C.*, No. 9437 (F.T.C.) .................................................6, 7, 8

*Slaughter v. Trump*, No. 1:25-cv-909 (D.D.C.)..........................................8, 11, 21

## CONSTITUTIONS, STATUTES, AND RULES

U.S. Const.
     art. II, §1, cl. 1...........................................................................................3, 19
     art. II, §3...................................................................................................3, 19
     art. III, §2 ........................................................................................................3
     amend. V.........................................................................................................3

Appellate Case: 25-1383    Page: 12    Date Filed: 04/16/2025 Entry ID: 5506938

5 U.S.C.

§1202 ...................................................................................3, 5, 28

§7521 ...................................................................................3, 5, 28

15 U.S.C.

§41 ..................................................................................3, 5, 21, 28

§45 (1934)..........................................................................22, 23, 45

§45 (2018)................................................................................45, 46

§45 ........................................................................................*passim*

§46 (1934)..................................................................................23, 45

§46 ..............................................................................................4

§53 ....................................................................................5, 20, 23

§57b ......................................................................................5, 23

§68d .............................................................................................23

§7803 ..........................................................................................23

16 U.S.C. §1385 .................................................................................23

28 U.S.C.

§1292 ...........................................................................................3

§1331 ...........................................................................................2

§1346 ...........................................................................................2

Pub. L. 75-447, 52 Stat. 111 (1938)....................................................5, 23

Pub. L. 93-153, 87 Stat. 576 (1973)....................................................5, 23

Pub. L. 93-637, 88 Stat. 2183 (1975)..................................................5, 23

Federal Rule of Appellate Procedure 4 ..............................................2-3

Appellate Case: 25-1383    Page: 13    Date Filed: 04/16/2025 Entry ID: 5506938

# REGULATIONS AND ADMINISTRARIVE MATERIALS

16 C.F.R.

§0.14 ...................................................................................4, 27
§3.1 ..............................................................................................43
§3.11 .......................................................................................20, 43
§§3.21-3.56 ...................................................................................27
§3.42 .......................................................................................4, 27
§3.43 ...................................................................................4, 27, 43
§3.51 ...................................................................................4, 27, 43
§3.52 ..............................................................................................20
§3.53 ..............................................................................................20
§3.54 .........................................................................4, 20, 27, 43, 45

FTC, *Statement of Basis and Purpose of Trade Regulation Rule 408*, 29 Fed. Reg. 8325 (July 2, 1964) ...................................................39

*Secretary of Education Review of ALJ Decisions*, 15 Op. O.L.C. 8 (1991) ..............................................................................................27

# OTHER AUTHORITIES

1 Dobbs, *Law of Remedies* (3d ed. 2018) ......................................40

3 Blackstone, William, *Commentaries* (1768).............................37, 41

4 Blackstone, William, *Commentaries* (1769)................................37

Balto, David, *Can the FTC be a Fair Umpire?*, The Hill (Aug. 14, 2013), https://bit.ly/3UtLIcY ......................................................43

Crane, Daniel A., *Debunking* Humphrey's Executor, 83 Geo. Wash. L. Rev. 1835 (2015)....................................................................23

Federalist No. 10 (Madison) ...........................................................42

FTC, Legal Library: Statutes, https://bit.ly/4cCPbhl (visited Apr. 15, 2025) ...........................................................................................4

FTC, *FTC Chairman Ferguson Congratulates Mark Meador on Confirmation as FTC Commissioner* (Apr. 10, 2025), https://bit.ly/4lyjp9f ...................................................................8

Appellate Case: 25-1383     Page: 14     Date Filed: 04/16/2025 Entry ID: 5506938

Letter from Acting Solicitor General Harris to Senator Durbin (Feb. 12, 2025), https://bit.ly/4ix1MEh ............................................................ 19-20

Melamed, A. Douglas, *Comments to FTC Workshop Concerning Section 5 of the FTC Act* (Oct. 14, 2008), https://bit.ly/4fgunfS ..................43

Statement of Chairman Andrew N. Ferguson (Apr. 3, 2025), https://bit.ly/4ihhseo ...........................................................................8

Appellate Case: 25-1383    Page: 15    Date Filed: 04/16/2025 Entry ID: 5506938

## INTRODUCTION

Last year, the Federal Trade Commission filed an administrative complaint against plaintiffs—the nation's three largest pharmacy-benefit managers—alleging that they engage in unfair competition and practices. The FTC's allegations lack merit, but this case is not about the merits. This case instead challenges the constitutionality of the commission's proceeding, and of its choice to bring its claims against plaintiffs in its own in-house tribunal rather than in an Article III court. The administrative proceeding violates the Constitution in three distinct ways.

First, as the government conceded in the district court, the FTC commissioners who initiate and oversee these internal adjudications and the ALJs who hear them are both improperly insulated from presidential accountability by statutory restrictions on the president's power to remove them. Those restrictions violate Article II by impeding the president's ability to supervise the executive branch and take care that the laws are faithfully executed. Second, the FTC's attempt to adjudicate its claims in-house runs afoul of Article III, which requires such claims to be brought in an Article III court. Third, the FTC's combination of prosecutorial and adjudicatory functions—together with its quarter-century in-house undefeated streak—offend the Fifth Amendment's Due Process Clause.

Plaintiffs sought a preliminary injunction to pause the FTC proceeding while the merits of these constitutional claims are decided in federal court. Without such relief, plaintiffs will remain subject to the unconstitutional proceeding—which the

1

Supreme Court has recognized is an irreparable harm. Yet both the government (despite its concession of unconstitutionality as to the removal restrictions) and the district court declined to pause the agency proceeding pending a final judgment here.

This Court should reverse and direct the entry of a preliminary injunction. The district court's denial of that relief rests on two legal errors. First, the court wrongly concluded that two cases from nearly a century ago foreclosed the court from ruling in plaintiffs' favor. Indeed, the Supreme Court recently made clear that one of those cases reflects a lenient approach to the separation of powers that can be extended no further than its facts. The district court impermissibly disregarded that directive. Second, the district court (while recognizing that being subjected to an unconstitutional proceeding causes irreparable harm) erroneously concluded that that harm was not great enough to warrant a preliminary injunction. The merits and harm here—combined with the public interest in avoiding unconstitutional executive actions—establish that a preliminary injunction is warranted.

## JURISDICTION

The district court had jurisdiction over plaintiffs' constitutional challenges to the FTC's ongoing administrative proceeding under 28 U.S.C. §§1331 and 1346(a)(2). On February 18, 2025, the court denied plaintiffs' motion for a preliminary injunction. App.323; R. Doc. 59 at 1. Plaintiffs noticed their appeal on February 21, 2025, App.346; R. Doc. 60 at 1, which was timely under Federal Rule

2

of Appellate Procedure 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. §1292(a)(1).

<h1 style="text-align:center">STATEMENT OF ISSUES</h1>

Whether the district court misapplied the law, and thereby abused its discretion, in denying plaintiffs' motion for a preliminary injunction.

Most Apposite Cases:

- *SEC v. Jarkesy*, 603 U.S. 109 (2024).

- *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023).

- *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020).

- *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 483 (2010).

Most Apposite Constitutional And Statutory Provisions:

- U.S. Constitution, article II, §1, clause 1, and §3.

- U.S. Constitution, article III, §2.

- U.S. Constitution, amendment V.

- 5 U.S.C. §§1202, 7521.

- 15 U.S.C. §§41, 45.

<h1 style="text-align:center">STATEMENT OF THE CASE</h1>

## A.  Statutory Background

Congress established the Federal Trade Commission in 1914 through the Federal Trade Commission Act ("Act" or "FTC Act").  Section 5 of the FTC Act

3

now declares "[u]nfair methods of competition … and unfair or deceptive acts or practices" to be "unlawful," and it "empower[s]" the FTC to prevent individuals and institutions from engaging in such practices. 15 U.S.C. §45(a).

Congress has granted the FTC a range of powers that are both executive and judicial in nature. In particular, the FTC can investigate potential violations, file administrative complaints, conduct hearings to determine whether persons are engaging in unlawful conduct, and issue decisions requiring them to cease and desist from such conduct, all in the agency's own tribunals. *See* 15 U.S.C. §§45(b), 46(d); *AMG Capital Management, LLC v. FTC*, 593 U.S. 67, 72 (2021). By regulation, moreover, FTC ALJs conduct the agency's trials and have the power, during the administrative proceeding, to control discovery, issue subpoenas, make evidentiary rulings, and regulate the conduct of the parties and their counsel. 16 C.F.R. §§0.14, 3.42(c), 3.43. After a trial, the ALJ issues a recommended decision, *id.* §3.51, which the commission reviews *de novo*, *id.* §3.54(a). A party may seek judicial review of the commissioners' decision, but the "findings of the Commission as to the facts, if supported by evidence, shall be conclusive" in court. 15 U.S.C. §45(c).

Since enacting the FTC Act, Congress has substantially expanded the FTC's executive power. Today, the agency "has enforcement or administrative responsibilities under more than 80 laws." FTC, Legal Library: Statutes, https://bit.ly/4cCPbhl. Congress has also authorized the agency to seek various remedies directly in federal court. *See AMG*, 593 U.S. at 72-73. In 1938, for

4

example, Congress granted the FTC the power to seek a temporary injunction or restraining order in federal court for false advertising pending the filing of an administrative complaint. Pub. L. 75-447, 52 Stat. 111, 115 (1938). And in the 1970s, Congress authorized the FTC to seek preliminary or permanent injunctions in federal court for any alleged violation of section 5, irrespective of whether an administrative complaint is imminent, and to seek monetary relief for certain violations in federal court. Pub. L. 93-153, 87 Stat. 576, 592 (1973) (codified at 15 U.S.C. §53(b)); Pub. L. 93-637, 88 Stat. 2183, 2201 (1975) (codified at 15 U.S.C. §57b(a)).

Despite the significant power wielded by the FTC's commissioners, the president can remove commissioners only "for inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. §41. Similarly, FTC ALJs are (despite their substantial authority) removable only for "good cause" as determined by the Merit Systems Protection Board ("MSPB"), a separate federal agency that adjudicates personnel matters. 5 U.S.C. §7521(a), (b)(1). Members of the MSPB, in turn, cannot be removed by the president except for "inefficiency, neglect of duty, or malfeasance in office." *Id.* §1202(d).

### B. Factual And Procedural Background

1. Plaintiffs Express Scripts, Caremark, and OptumRx are three pharmacy-benefit managers ("PBMs") that compete with each other and many other smaller PBMs. PBMs contract with health-plan sponsors—such as employers,

5

unions, and government entities—to manage the prescription-drug benefits the plans make available to health plan members. App.323-333; R. Doc. 59 at 1-2.[1]

PBMs develop "drug formularies," which are lists of prescription drugs that health plans cover for their members. Complaint ¶¶28, 32-38, 50, *In re Caremark Rx, L.L.C.*, No. 9437 (F.T.C. Sept. 20, 2024) ("FTC Complaint"). PBMs also negotiate with drug manufacturers over key cost drivers for plan sponsors and their members, with the goal of securing cost savings. Drug manufacturers independently set list prices for prescription drugs, prices that—like a car's sticker price—do not reflect discounts. *Id.* ¶¶2, 6, 9, 40, 119, 135, 236-241. PBMs, in turn, negotiate discounts (or rebates) with manufacturers to reduce drug costs for benefit plans and their members. *Id.* ¶¶31, 40. Those discounts take effect when a plan sponsor decides to prefer that manufacturer's drug on the sponsor's formulary, which can boost a given drug's market share and sales volume. *Id.* ¶¶38-39, 44.

By giving manufacturers an incentive to compete for formulary placement, PBMs have substantially lowered the cost of many drugs. FTC Complaint ¶¶44,

---

[1]     In this brief, "Express Scripts," "Caremark," and "OptumRx" refer collectively to the entities named as respondents in the FTC's complaint. Specifically, "Express Scripts" refers collectively to Express Scripts, Evernorth, Medco, and Ascent. "Caremark" refers collectively to Caremark Rx, L.L.C., and Zinc Health Services, LLC. "OptumRx" refers collectively to OptumRx, Inc.; OptumRx Holdings, LLC; and Emisar Pharma Services LLC. These usages are not an admission or statement of the corporate form or relationship of the entities at issue.

6

117.  Plan sponsors can then decide what to do with the resulting cost savings.  For example, they may share rebates with members or use them to reduce plan premiums, lower members' out-of-pocket costs, or otherwise improve plan benefit offerings.  *Id.* ¶¶55, 66, 184, 196-197.

2.      In September 2024, the FTC voted to issue an administrative complaint against plaintiffs.  FTC Complaint p.45.  Only the FTC's then-chair Lina Khan and the other two Democratic commissioners participated in the vote; the two Republican commissioners recused themselves from the matter.  *Id.*

The complaint alleges that PBMs' practices have prompted drug manufacturers to raise the list price of insulin, and that those practices constitute an "unfair method of competition" and an "unfair practice" in violation of section 5 of the FTC Act.  FTC Complaint ¶¶255-274.  The complaint seeks relief in the form of cease-and-desist orders.  *Id.* pp.43-44.  The requested relief would force PBMs to change which drugs they place on their formularies, prohibit PBMs from accepting compensation based on a drug's "list price," and prohibit PBMs from "designing—or assisting with designing—a benefit plan that bases patients' deductibles or coinsurance" on the list price of a drug rather than the net cost after rebates.  *Id.* pp.44-45.

Although the FTC regularly sues in federal court, it chose to pursue this complaint in-house before an FTC ALJ—a forum in which the FTC has not lost for more than a quarter century.  App.21, 41; R. Doc. 1 ¶¶7, 66.  The administrative

proceeding is currently in discovery, with document production underway. Trial was initially scheduled for August 2025, App.125; R. Doc. 44 at 5. But on March 18, President Trump announced that he was removing the two remaining FTC commissioners overseeing the proceeding (the third, Lina Khan, had previously resigned). *See* Complaint ¶33, *Slaughter v. Trump*, No. 1:25-cv-909 (D.D.C. Mar. 27, 2025), ECF 1. With no non-recused commissioner to direct the proceeding, the commission (through a regulatory delegation to the General Counsel) granted the parties' joint motion to stay the proceedings for 105 days and reschedule the trial for 225 days after the stay is lifted. Order Staying Administrative Adjudication, *In re Caremark Rx, L.L.C.*, No. 9437 (F.T.C. Apr. 1, 2025). That stay remains in place, although Commissioner Andrew Ferguson—whom President Trump had appointed as Chairman after Lina Khan resigned—subsequently "[un-]recused" himself "to ensure that the case can continue." Statement of Chairman Andrew N. Ferguson (Apr. 3, 2025), https://bit.ly/4ihhseo. The Senate has also since confirmed President Trump's nominee Mark Meador to serve as the FTC's newest commissioner. FTC, *FTC Chairman Ferguson Congratulates Mark Meador on Confirmation as FTC Commissioner* (Apr. 10, 2025), https://bit.ly/4lyjp9f.

3. In November 2024, plaintiffs filed this collateral action against the FTC, its commissioners, and the ALJ overseeing the proceeding, alleging violations of Articles II and III and the Fifth Amendment to the Constitution. App.53-56; R. Doc. 1 ¶¶88-108. The same day they sued, plaintiffs moved to preliminarily enjoin

8

the administrative proceeding pending resolution of this action. App.79; R. Doc. 24. While that motion was pending, the government notified the district court that it "will no longer defend" the constitutionality of for-cause removal protections for FTC commissioners and ALJs because those removal protections violate Article II. *See* App.317; R. Doc. 57 at 1.

The district court nonetheless denied a preliminary injunction. App.344; R. Doc. 59 at 22. It held that plaintiffs were unlikely to succeed on the merits of their claims; that they had not established sufficient irreparable harm; and that the balance of equities and public interest did not support temporarily pausing the FTC proceeding pending resolution of this case. App.326-344; R. Doc. 59 at 4-22.

Regarding likelihood of success, the court held (App.332; R. Doc. 59 at 10) that plaintiffs' Article II challenge to the FTC commissioners' removal protections is foreclosed by *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). And it held that FTC ALJs' multi-layer removal protections do not violate Article II because they fall into an exception permitting for-cause removal protections for "inferior officers with narrowly defined duties." App.334; R. Doc. 59 at 12 (emphasis and quotation marks omitted). The court acknowledged the Fifth Circuit's holding in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), *aff'd on other grounds*, 603 U.S. 109 (2024), that multiple layers of for-cause removal protections for SEC ALJs are unconstitutional, but deemed that case inapposite here on the

9

ground that SEC and FTC ALJs exercise meaningfully different powers. App.335; R. Doc. 59 at 13.

The district court also rejected plaintiffs' Article III and due-process claims. It ruled (App.327; R. Doc. 59 at 5) that plaintiffs' Article III claim is foreclosed by *Arkansas Wholesale Grocers' Association v. FTC*, 18 F.2d 866 (8th Cir. 1927), a case that addressed the FTC Act's judicial-review provision. 15 U.S.C. §45(c). And it ruled (App.337-338; R. Doc. 59 at 15-16) that plaintiffs' structural due-process challenge is foreclosed by the Supreme Court's holding that "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation," *Withrow v. Larkin*, 421 U.S. 35, 58 (1975). The district court did not address plaintiffs' argument that the FTC's perfect in-house win rate for the last quarter century constitutes "more." *See* App.105; R. Doc. 24 at 20; App.164; R. Doc. 45 at 13.[2]

Next, the district court accepted plaintiffs' argument that they are suffering irreparable injury under *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023), by being subjected to an ongoing unconstitutional agency proceeding. But the court held that showing irreparable harm "is not enough for a preliminary injunction." App.339; R.

---

[2]    The court also held that derogatory statements about PBMs by the three Democratic commissioners who approved the administrative complaint did not alter the likelihood of success on plaintiffs' due process challenge. Plaintiffs are not relying on those statements on appeal.

10

Doc. 59 at 17. Instead, the court concluded that the harm must be "great," a standard that in the court's view was not met here, App.339-340; R. Doc. 59 at 17-18.

Finally, analyzing the balance of equities and public interest—which merge because the government is the opposing party—the district court concluded (1) that plaintiffs at most alleged a "bare violation of the Constitution," and thus "have not shown that they are likely to be injured more than nominally," App.341-342; R. Doc. 59 at 19-20, and (2) that the government's interest in enforcing the FTC Act tilts the balance of equities and public interest in the government's favor, App.342-343; R. Doc. 59 at 20-21.

Plaintiffs timely appealed and sought an injunction pending appeal, which this Court denied in an unsigned order. Order, Doc. ID 5498208 (Mar. 20, 2025). The denial order was issued two days after President Trump announced his decision to remove the two remaining Democratic FTC commissioners, but before plaintiffs could address the impact of those removals on this case in their reply brief. The two commissioners have sued to challenge their removal. *See* Complaint, *Slaughter v. Trump*, No. 1:25-cv-909 (D.D.C. Mar. 27, 2025).

## SUMMARY OF ARGUMENT

The district court erred in denying plaintiffs' motion for a preliminary injunction to pause the FTC proceeding while Article III courts resolve the merits of plaintiffs' constitutional claims. Plaintiffs are likely to succeed on those claims, they

11

have established irreparable harm, and the merged balance-of-equities/public-interest factor favors a pause.

I.    A likelihood of success on just one of plaintiffs' Article II, Article III, and Fifth Amendment claims would support a preliminary injunction. Plaintiffs are likely to succeed on all three.

A.    Article II vests all executive power in the president, who must therefore have the authority to hold subordinates accountable. As a general rule, statutory restrictions on the president's ability to remove executive officers unconstitutionally impinge on that line of accountability. As the government admits, the for-cause removal protections for FTC commissioners and ALJs do precisely that.

1.    FTC commissioners' for-cause removal protections violate Article II. The Supreme Court has recently invalidated a range of removal restrictions for agency heads who exercise substantial executive power. Like the agency heads in those cases, FTC commissioners wield a broad range of executive powers, so the president must be able to remove them at will.

Contrary to the district court's conclusion, *Humphrey's Executor* does not foreclose this claim. As the Supreme Court has explained, that case held only that the removal restrictions on FTC commissioners were permissible in light of the agency "as it existed in 1935"—when the Court viewed the commission "as exercising 'no part of the executive power.'" *Seila Law v. CFPB*, 591 U.S. 197, 215 (2020). The modern-day FTC, however, exercises vastly more executive power than

12

it did then. *Id.* This Court would therefore have to extend *Humphrey's Executor* to uphold the commissioners' removal restrictions. Recent Supreme Court precedent precludes that result.

2. FTC ALJs are also unconstitutionally insulated from presidential supervision. The Supreme Court has held that the president cannot constitutionally be "restricted in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer." *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 483-484, 513-514 (2010). That is precisely the unconstitutional scheme shielding FTC ALJs, who are insulated by not one but three layers of for-cause removal restrictions (for the FTC ALJ, the MSPB, and the FTC commissioners).

The district court erred in attempting to shoehorn FTC ALJs into the limited "exception[]" to presidential accountability for "inferior officers with limited duties and no policymaking or administrative authority," *Seila Law*, 591 U.S. at 218. That exception applies where "only one level of protected tenure separate[s] the President from an officer exercising executive power." *Free Enterprise*, 561 U.S. at 494-495. In any event, FTC ALJs exercise substantial duties, including both policymaking and administrative authority.

3. The government did not dispute any of the foregoing when opposing an injunction pending appeal, instead arguing that plaintiffs cannot show that they are prejudiced by the Article II violations, relying on *Collins v. Yellen*, 594 U.S. 220

13

(2021). But *Collins*' inquiry into the proper remedy for an established Article II violation is not relevant to the question whether plaintiffs are likely to succeed on the merits of their Article II claims in the first place. In any event, because *Collins* addressed only retrospective relief, it did not consider the showing needed to enjoin an *ongoing* unconstitutional proceeding. *Axon* makes clear that being subjected to a proceeding before an unconstitutionally composed agency is a "'here-and-now' injury" that a federal court can remedy. *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 192 (2023). Plaintiffs do not need to show anything more at this stage to be likely to succeed on their Article II claims.

B.     The FTC proceeding violates Article III because the FTC seeks to adjudicate plaintiffs' private rights administratively.

1.     The Supreme Court "ha[s] repeatedly explained that matters concerning private rights may not be removed from Article III courts." *SEC v. Jarkesy*, 603 U.S. 109, 127 (2024). And "[i]f a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, [meaning] adjudication by an Article III court is mandatory." *Id.* at 128. To determine whether a statutory cause of action is "in the nature of an action at common law," courts consider not whether the claims are identical but whether the two claims "target the same basic conduct" and whether Congress drew upon common-law concepts in creating the statutory cause of action. *Id.* at 125-126, 128. Agencies may adjudicate a case in-house only if it involves "public rights," a "care[fully]" defined class of cases—like those

14

involving the imposition of tariffs, relations with Indian tribes, public lands, and public benefits—that "historically could have been determined *exclusively* by the executive and legislative branches." *Id.* at 128, 130 (emphasis added).

Section 5 claims are in the nature of common-law actions for unfair competition and unfair trade practices, and thus implicate paradigmatic private rights. They target the same basic conduct as these common-law claims, and Congress drew on common-law concepts of unfair trade practices, unfair competition, and anticompetitive practices to create section 5. Section 5 does not concern matters recognized by the Supreme Court as falling into the carefully limited category of public rights cases. And section 5 claims could not historically have been determined exclusively by the executive and legislative branches. To the contrary, at common law, courts unquestionably adjudicated claims for unfair competition, unfair trade practices, and anticompetitive practices.

2.     The district court incorrectly concluded that plaintiffs' Article III claim is foreclosed by *Arkansas Wholesale*. That case addressed a due-process challenge to a provision of the FTC Act that plaintiffs have not challenged—the provision prescribing courts' standard of review of FTC factual findings. *Arkansas Wholesale* never addressed the Article III challenge to FTC adjudications raised here (much less with the benefit of the Supreme Court's decision in *Jarkesy*).

C.     The FTC proceeding violates due process.

15

1.    The commission's in-house adjudicatory scheme unconstitutionally "combine[s] the functions of investigator, prosecutor, and judge under one roof." *Axon*, 598 U.S. at 215 (Gorsuch, J., concurring in judgment). This commingling of functions is coupled with the striking fact that, in the past quarter century, the FTC has found liability in every case where it has ruled on the merits. *See Axon Enterprise, Inc. v. FTC*, 986 F.3d 1173, 1187 (9th Cir. 2021) (subsequent history omitted). Plaintiffs have no prospect of a fair trial that comports with an appearance of justice in this forum.

2.    Again, the district court erroneously concluded that precedent forecloses plaintiffs' claim, relying this time on *Withrow v. Larkin*. That case held only that "the combination of investigative and adjudicative functions does not, *without more*, constitute a due process violation." 421 U.S. at 58 (emphasis added). Here, there is "more"—namely, the FTC's unbroken in-house winning streak over the last 25 years (which the district court ignored). Moreover, like *Humphrey's Executor*, the other two cases the district court relied on addressed an early twentieth-century FTC, different in kind from its modern counterpart, which exercises a far broader range of enforcement and adjudicatory powers. Those cases did not decide whether the FTC's current mix of powers violates due process.

II.    Plaintiffs have suffered and will continue to suffer irreparable harm absent a preliminary injunction. As the Supreme Court has held, "being subjected 'to unconstitutional agency authority' … [before] 'an unaccountable ALJ' … is 'a

here-and-now injury'" that "is impossible to remedy once the proceeding is over." *Axon*, 598 U.S. at 191. That is the definition of irreparable harm. The district court mistakenly believed that plaintiffs must show that the harm from a constitutional violation is not only irreparable but also sufficiently "great" to warrant injunctive relief. App.338; R. Doc. 59 at 16. This Court's cases do not support treating the constitutional violations at issue as insufficient or as implicating second-class rights. So long as they are not speculative, such "constitutional violations constitute irreparable harm." *Morehouse Enterprises, LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023). In any event, being subjected to an unconstitutionally structured proceeding constitutes "great" irreparable harm. The separation-of-powers and due-process principles at stake here are foundational to our constitutional system and preserve individual liberty.

III. The balance of the equities and the public interest overwhelmingly favor a pause of the FTC proceeding while Article III courts consider plaintiffs' constitutional challenges. The public has an interest in halting unlawful agency action, and the government will not be harmed by a pause in the proceedings. Indeed, a pause would benefit the government and the public, permitting the FTC to get its house in order in the wake of the recent removals of the FTC commissioners and their subsequent lawsuit challenging that action.

17

**STANDARD OF REVIEW**

This Court reviews "a district court's ultimate ruling on a preliminary injunction for abuse of discretion," but reviews a district court's "underlying legal conclusions de novo." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).

**ARGUMENT**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors (balance of equities and public interest) "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Because all the factors weigh in favor of an injunction here, the district court abused its discretion in denying that relief.

**I.    THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS**

A "movant shows a likelihood of success on the merits when it demonstrates a 'fair chance,' not necessarily 'greater than fifty percent,' that it will ultimately prevail." *Cigna Corporation v. Bricker*, 103 F.4th 1336, 1343 (8th Cir. 2024). Plaintiffs have at least a "fair chance" of success on each of their three claims.

18

## A. The FTC's Structure Violates Article II

Plaintiffs will likely succeed on their claims that the for-cause removal restrictions for FTC commissioners and ALJs violate Article II. In fact, the government *agrees* that the commissioners and ALJs are unconstitutionally protected from presidential supervision.

"Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. art. II, §1, cl. 1; *id*. art. II, §3). Accordingly, Article II requires that the president retain the power "to keep [executive] officers accountable," including "by removing them from office." *Free Enterprise*, 561 U.S. at 483. Restrictions on the president's ability to remove subordinate executive officers violate Article II because such restrictions insulate those officers from presidential "control" and "thus from that of the people." *Id.* at 499. Article II's "general rule," then, is that the president's "removal power" should be "unrestricted." *Seila Law*, 591 U.S. at 215.

The FTC's structure—which contains both statutory for-cause removal restrictions on commissioners and multi-layered for-cause removal restrictions on ALJs—runs headlong into these core Article II guardrails. By immunizing commissioners and ALJs from presidential oversight, the removal restrictions work the very "diffusion of accountability" that the Framers sought to prevent. *Free Enterprise*, 561 U.S. at 497-498. Indeed, even the government now agrees: It no

19

longer defends the constitutionality of the for-cause removal protections for either FTC commissioners or ALJs. *See* Add.12; R. Doc.57 at 1; *see also* Letter from Acting Solicitor General Harris to Senator Durbin (Feb. 12, 2025), https://bit.ly/4ix1MEh.

### 1. FTC Commissioners

The statutory limitations on the president's power to remove the FTC commissioners violate Article II.

a. If "an agency does important work," the president must have the power to remove its leaders, no matter the agency's "size or role." *Collins v. Yellen*, 594 U.S. 220, 252 (2021). For that reason, the Supreme Court recently invalidated a range of removal restrictions for agency heads who exercise substantial executive power. *See Seila Law*, 591 U.S. at 225 (CFPB); *Collins*, 594 U.S. at 230, 242 (FHFA).

The same result is compelled here. FTC commissioners are agency heads who exercise vast executive powers. They "investigate" people and corporations, "set enforcement priorities," "initiate prosecutions," and, once administrative proceedings are instituted, "oversee [those] adjudications." *Seila Law*, 591 U.S. at 225; *see* 15 U.S.C. §§45(a), (m), 53; 16 C.F.R. §§3.11, 3.52-3.54. They can also issue final decisions in administrative adjudications, order people and corporations to cease and desist activities the commissioners deem unlawful, and "seek daunting monetary penalties against private parties on behalf of the United States in federal

court," *Seila Law*, 591 U.S. at 218-219; *see also* 15 U.S.C. §45(b), (m); 16 C.F.R. §3.54.

Despite these broad powers, Congress has limited the president to removing commissioners only "for inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. §41. Such restrictions "'make it impossible for the President … to take care that the laws be faithfully executed.'" *Seila Law*, 591 U.S. at 214 (omission in original) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)). They also risk saddling the president with subordinate officers whose policy disagreements or "lack of loyalty to the service" could thwart execution of the laws. *Myers*, 272 U.S. at 131. Restrictions on the president's ability to remove agency heads like the FTC commissioners are particularly pernicious because agency heads determine how an entire agency and its personnel will exercise executive power. *See Seila Law*, 591 U.S. at 213-215; *Collins*, 594 U.S. at 251.

Recent events underscore this Article II problem. On March 18, President Trump removed the only two remaining FTC commissioners who were not recused from this matter at the time. They have since sued, contending that by law they are still commissioners. *See* Complaint, *Slaughter v. Trump*, No. 1:25-cv-909 (D.D.C. Mar. 27, 2025). If the courts agree, that would result in FTC commissioners having the power to prosecute agency proceedings against the president's will. In the meantime, the agency proceedings here will continue (after a short pause agreed to by the parties in light of the removals, *supra* p.8) under an ALJ who is

21

unconstitutionally protected from removal. These events post-dating the district court's decision leave the Article II violation beyond serious dispute.

b. The district court held that plaintiffs are not likely to succeed on their Article II claim because this case involves the same agency as *Humphrey's Executor*, and so that case controls. App.332-333; R. Doc. 59 at 10-11. But the Supreme Court has expressly limited *Humphrey's Executor* to its facts by characterizing the decision as "the outermost constitutional limit[]" on permissible congressional restrictions on the president's removal power. *Seila Law*, 591 U.S. at 215, 218-219 & n.4. The decision thus applies to the FTC only "as it existed in 1935," when the Court viewed the FTC "as exercising 'no part of the executive power'" but rather functioning as "'an administrative body' that performed 'specified duties as a legislative or … judicial aid.'" *Id.* at 215 (quoting *Humphrey's Executor*, 295 U.S. at 628). So if the FTC now exercises greater executive power than it did then, *Humphrey's Executor* would have to be extended to justify removal restrictions on the FTC as it exists in 2025—contrary to *Seila Law*'s prohibition on such an extension.

The FTC does exercise vastly more executive power today than it did in 1935. *Harris v. Bessent*, 2025 WL 980278, at *8 n.90 (D.C. Cir. Mar. 28, 2025) ("*Harris II*") (Walker, J., concurring), *vacated on reconsideration en banc*, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) ("*Harris III*"), *administrative stay granted*, 2025 WL 1063917 (U.S. Apr. 9, 2025) (Roberts, C.J., in chambers) ("*Harris IV*"). Under the original 1914 FTC Act, the commission had no power to sue in federal court. To

22

enforce a cease-and-desist order, the agency had to file its record with a court of appeals, which would rule on the merits of the FTC's case. 15 U.S.C. §45 (1934); *see also Humphrey's Executor*, 295 U.S. at 620. The court of appeals also could direct the FTC to do more fact-finding. 15 U.S.C. §45 (1934). Beyond these powers, the FTC was cabined to investigating, requiring corporations to issue reports, publishing reports, and classifying and making rules for corporations. *Id.* §46 (1934).

The FTC Act, however, has been amended multiple times since *Humphrey's Executor*, giving the "2025 FTC … [far] greater power than the 1935 FTC." *Harris II*, 2025 WL 980278, at *8 n.90 (Walker, J., concurring). In 1938, for example, Congress empowered the FTC to sue directly in federal court and seek a temporary injunction or restraining order in false-advertising cases. Pub. L. 75-447, 52 Stat. 111, 115 (1938). And in the 1970s, Congress authorized the agency to seek permanent injunctions in federal court for any section 5 violations, Pub. L. 93-153, 87 Stat. 576, 592 (1973) (codified at 15 U.S.C. §53(b)), and to seek restitution for injured consumers, Pub. L. 93-637, 88 Stat. 2183, 2201 (1975) (codified at 15 U.S.C. §57b). Since then, scores of statutes (typically consumer statutes) have been assigned to the FTC for enforcement, further expanding its executive power. *See, e.g.*, 15 U.S.C. §7803; *id.* §68d; 16 U.S.C. §1385(d)(3)(c)(iii). In sum, "[t]he predominant character of the agency has become that of a traditional law

enforcement department."  Crane, *Debunking* Humphrey's Executor, 83 Geo. Wash. L. Rev. 1835, 1868 (2015).

These differences between the FTC in 1935 and today foreclose the district court's reliance on *Humphrey's Executor*.  That decision was never a blank check to Congress to remake the FTC without regard to the specific limitations that saved its structure in 1935.  And under *Seila Law*, it *may not* be extended because it represents "the outermost constitutional limit[]" on permissible congressional restrictions on the president's removal power.  591 U.S. at 215, 218-219 & n.4.

For similar reasons, a motions panel of the D.C. Circuit recently concluded that for-cause removal protections for members of two other multi-member agencies—the National Labor Relations Board and the MSPB—are unconstitutional.  *See Harris II*, 2025 WL 980278, at *1.  That case is ongoing—the panel's decision was vacated upon reconsideration en banc, *see Harris III*, 2025 WL 1021435, at *1, but Chief Justice Roberts has temporarily stayed the officials' reinstatement, *see Harris IV*, 2025 WL 1063917.  In the meantime, the opinions of the judges in the panel majority (and of their supporting colleagues on reconsideration *en banc*) reflect the correct approach to *Humphrey's Executor*.  As Judge Walker explained, the Supreme Court has consistently declined to extend "*Humphrey's* to any new contexts, [so] [the court] cannot extend *Humphrey's*—not even an inch."  *Harris II*, 2025 WL 980278, at *13 (Walker, J., concurring); *accord*

24

*id.* at \*21 (Henderson, J., concurring); *Harris III*, 2025 WL 1021435, at \*2-3 (Rao, J., dissenting, joined by Henderson, Katsas, and Walker, JJ.).

Then-Judge Kavanaugh made the same point in a dissenting opinion that *Seila Law* ultimately vindicated, asserting that courts should "hold the line and not allow encroachments on the President's removal power beyond what *Humphrey's Executor* … already permit[s]." *PHH Corporation v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting). Here, by contrast, the district court failed "to distinguish" between "the '1935 FTC'" and "the 2025 FTC, which exercises greater power than the 1935 FTC," *Harris II*, 2025 WL 980278, at \*8 n.90 (Walker, J., concurring), thereby extending *Humphrey's Executor* more than an inch—and well beyond the "outermost constitutional limit[,]" *Seila Law*, 591 U.S. at 218.

The district court erred in concluding (App.330-331; R. Doc. 59 at 8-9) that *United States v. Cavanaugh*, 643 F.3d 591 (8th Cir. 2011), foreclosed it from distinguishing *Humphrey's Executor*. *Cavanaugh* explained that "when the Supreme Court issues an opinion with reasoning that appears to undercut an earlier decision, lower courts must continue to apply the earlier ruling *in factual contexts analogous* to the earlier case until such time that the Supreme Court itself overturns the earlier case." 643 F.3d at 606 (emphasis added). But as explained, the current FTC does *not* present a "factual context[] analogous to the earlier case," *id.*, i.e., to the FTC as it existed in 1935 when *Humphrey's Executor* was decided. Especially

25

because the Supreme Court has taken "care to limit [the] holding" of *Humphrey's*, that decision "should not be extended" by this Court to new contexts in which it "does not control."  *In re Miller*, 454 F.3d 899, 902 (8th Cir. 2006).

Finally, to the extent necessary, plaintiffs preserve the argument that the Supreme Court should overrule *Humphrey's Executor* because it is inconsistent with a proper understanding of Article II and the Supreme Court's subsequent decisions interpreting that provision.

### 2.    FTC ALJs

FTC ALJs are also unconstitutionally insulated from presidential accountability.  Again, the government now agrees.  *See supra* p.9.

a.    As discussed, Article II requires the president to have some means to remove subordinate officers who exercise part of the executive power.  *See Free Enterprise*, 561 U.S. at 513-514.  One corollary of this rule is that the president cannot constitutionally be "restricted in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer."  *Id.* at 484.  The multiple layers insulating FTC ALJs from removal violate that constitutional principle.

i.    FTC ALJs are inferior officers of the United States because they are frontline agency decisionmakers who exercise several kinds of "significant … authority."  *Lucia v. SEC*, 585 U.S. 237, 248-249 (2018).

26

*First*, ALJs wield substantial adjudicative power, since they have the authority, "much like a regular trial judge, to resolve motions, hold a hearing, and then issue a decision." *Axon*, 598 U.S. at 181 (citing 16 C.F.R. §§3.21-3.56). ALJs "are officials to whom the Commission … delegates the initial performance of statutory fact-finding functions and initial rulings on conclusions of law." 16 C.F.R. §0.14. In performing those functions, ALJs possess "significant discretion" and powerful "tools" "in conducting adversarial inquiries," *Lucia*, 585 U.S. at 248. ALJs hold hearings, control discovery, issue subpoenas, decide on the admissibility of evidence, and issue orders to keep proceedings moving. 16 C.F.R. §§3.42(c), 3.43. At the end of administrative proceedings, moreover, an ALJ must file "[a] recommended decision." *Id.* §3.51(a), (c)(1). The Commission then reviews the ALJ's decision and may "adopt, modify, or set aside the recommended findings, recommended conclusions, and proposed rule or order." *Id.* §3.54(a). In sum, like "SEC ALJ[s]," FTC ALJs "exercis[e] authority 'comparable to' that of a federal district judge conducting a bench trial," *Lucia*, 585 U.S. at 242 (citation omitted).

*Second*, FTC ALJs exercise significant policymaking and administrative authority. The Department of Justice has long recognized that ALJs "determine, on a case-by-case basis, the *policy* of an executive branch agency," "fill[ing] statutory and regulatory interstices comprehensively with [their] own *policy* judgments." *Secretary of Education Review of ALJ Decisions*, 15 Op. O.L.C. 8, 14-15 (1991) (emphases added). The Supreme Court has likewise recognized more generally that

27

agency adjudication can be used to "formulat[e] … agency policies" and "promulgate a new standard" to "govern future conduct" of non-parties. *NLRB v. Bell Aerospace Company*, 416 U.S. 267, 292-294 (1974). And the cease-and-desist orders that FTC ALJs draft can later become the basis for "civil penalt[ies]" against *non-parties* that were "not" "subject to" the original order, so long as those non-parties receive notice of the ruling. 15 U.S.C. §45(m)(1)(B); *see also LabMD, Inc. v. FTC*, 894 F.3d 1221, 1324 n.38 (11th Cir. 2018).

Despite these significant powers, FTC ALJs are insulated from presidential supervision by three layers of for-cause removal protection. The FTC can remove an ALJ only "for good cause established and determined by the Merit Systems Protection Board," and only "on the record after opportunity for [a] hearing" before that Board. 5 U.S.C. §7521(a), (b)(1). FTC commissioners who can initiate such ALJ-removal proceedings, moreover, are themselves removable by the president only for cause. 15 U.S.C. §41; *supra* p.5. And the president can remove MSPB members, who adjudicate the removal of FTC ALJs, "only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. §1202(d).[3]

ii.   FTC ALJs' multiple layers of for-cause removal protection are unconstitutional. They prevent the president from removing ALJs "even if the President determines that [they are] neglecting [their] duties or discharging them

---

[3]   As noted, *supra* p.24, the constitutionality of the for-cause removal restrictions on MSPB members is currently being litigated.

Appellate Case: 25-1383     Page: 43     Date Filed: 04/16/2025 Entry ID: 5506938

improperly." *Free Enterprise*, 561 U.S. at 484. Those judgments are instead "committed to []other officer[s], who may or may not agree with the President's determination, and whom the President cannot remove simply because th[ose] officer[s] disagree[] with" him. *Id.* In other words, "the President can neither oversee the [ALJs] himself nor attribute [their] failings to those whom he can oversee." *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (quotation marks omitted). FTC ALJs are thus "immune from Presidential oversight, even as they exercise[] power in the people's name." *Free Enterprise*, 561 U.S. at 497.

Applying these principles, the Fifth Circuit has held that virtually the same three layers of for-cause protection for SEC ALJs violate Article II. In doing so, the court agreed with the logic advanced here: "SEC ALJs are inferior officers; they can only be removed by the SEC Commissioners if good cause is found by the [MSPB]; SEC Commissioners and MSPB members can only be removed by the President for cause; so, SEC ALJs are insulated from the President by at least two layers of for-cause protection from removal, which is unconstitutional under *Free Enterprise*." *Jarkesy*, 34 F.4th at 464. That is a straightforward and faithful application of Supreme Court precedent; this Court should adopt the same approach.

b. In reaching a contrary conclusion, the district court here determined that FTC ALJs fall under a limited "exception" to presidential accountability for "'inferior officers with limited duties and no policymaking or administrative

29

authority.'" App.334; R. Doc. 59 at 12 (quoting *Seila Law*, 591 U.S. at 218). That is wrong for two independent reasons.

*First*, the Supreme Court has invoked this exception only twice, and in each instance, "only *one* level of protected tenure separated the President from an officer exercising executive power." *Free Enterprise*, 561 U.S. at 494-495 (emphasis added) (citing *United States v. Perkins*, 116 U.S. 483 (1886) and *Morrison v. Olson*, 487 U.S. 654 (1988)). The Court has expressly "declined to extend" the "exception" to inferior officers who—like FTC ALJs—are "insulated by two layers of for-cause removal protection." *Seila Law*, 591 U.S. at 215 (citing *Free Enterprise*, 561 U.S. at 483, 514). Thus, even if it were true that FTC ALJs have "limited duties and no policymaking or administrative authority," App.334; R. Doc. 59 at 12, they would not fall into any exception to the president's ordinary removal authority under Article II.

*Second*, FTC ALJs have both policymaking and administrative authority. As discussed, *supra* pp.27-28, ALJs establish agency policies that govern future conduct through their adjudicative powers. And they unquestionably possess "administrative authority." App.334; R. Doc. 59 at 12. They "critically shape the administrative record," *Lucia*, 585 U.S. at 248, by controlling discovery, admitting evidence, issuing subpoenas, and ruling on dispositive pre-trial motions, *supra* p.27. These "important executive functions" must be subject to presidential supervision. *Jarkesy*, 34 F.4th at 463. Even the current FTC Chair agrees. *See In re H&R Block,*

30

*Inc.*, 2024 WL 4544208, at *8 (F.T.C. Oct. 18, 2024) (Ferguson, Comm'r, dissenting in part).

The district court attempted to distinguish the Fifth Circuit's decision in *Jarkesy* by stating that there are "notable differences between the SEC's ALJs and the FTC's." App.335; R. Doc. 59 at 13. But the court pointed to only a single difference: that decisions of SEC ALJs are "often … final and binding," whereas FTC ALJs make "recommended decision[s]." *Id.* That is unavailing; regardless of whether an ALJ's decisions are "recommended" or "often" "final," "the [administrative] power of the ALJ in the hearing room" "does not change." *H&R Block*, 2024 WL 4544208, at *9-10 (Ferguson, Comm'r, dissenting in part). ALJs that issue recommended decisions "still … play a major role in shaping the administrative record," and "their recommendations still carry weight—formally or informally." *ABM Industry Groups v. DOL*, 2024 WL 4642962, at *4-5 (S.D. Tex. Oct. 30, 2024). In fact, every time an ALJ has issued a merits decision in the FTC's favor, including after ALJs began issuing recommended decisions, the Commission also ruled for itself on the merits. *See* App.60; R. Doc. 1-1 at 1. There is thus no constitutionally significant difference between FTC and SEC ALJs. Both "exercise the same on-the-ground authority over litigants." *H&R Block*, 2024 WL 4544208, at *9. And both are "sufficiently insulated from removal" that "the President cannot take care that the laws are faithfully executed." *Jarkesy*, 34 F.4th at 465.

31

The district court also placed undue weight on this Court's one-sentence unsigned order denying a motion for an injunction pending appeal in *H&R Block, Inc. v. Himes*, No. 24-2626 (8th Cir. Sept. 13, 2024). The district court there concluded that the plaintiff was unlikely to succeed on the merits of its argument that the removal protections for FTC ALJs violate Article II. *See H&R Block Inc. v. Himes*, 2024 WL 3742310, at *5-6 (W.D. Mo. Aug. 1, 2024) (subsequent history omitted). That decision was wrong for the reasons discussed above. And an unreasoned and unsigned order denying an injunction pending appeal is not binding and does not preclude a later merits decision that the applicant is likely to succeed on the merits, even in the same case. Just last year, for example, a merits panel of this Court reversed the denial of a preliminary injunction after a motions panel had denied an injunction pending appeal. *Firearms Regulatory Accountability Coalition, Inc. v. Garland*, 112 F.4th 507, 511 (8th Cir. 2024).

### 3. No Heightened Prejudice Showing Is Required

The government disputes none of the foregoing. In opposing an injunction pending appeal, it merely argued that no interim relief was warranted because plaintiffs had failed to show prejudice from the unconstitutionally structured proceeding. But that rests on a fundamental misreading of *Collins v. Yellen*, 594 U.S. 220 (2021). There, in a structural constitutional challenge to a completed agency proceeding, the Court indicated that the plaintiffs could obtain relief if they could show some "compensable harm." *Id.* at 259. But *Collins* addressed only what

32

"retrospective relief" was available after an improperly insulated official acted and where the plaintiffs "no longer ha[d] a live claim for prospective relief." *Id.* at 257.

*Collins'* inquiry into the proper remedy for an established Article II violation is not relevant here, where the question is whether plaintiffs are likely to succeed on the merits of their Article II claims in the first place. In any event, because *Collins* addressed only "retrospective relief," 594 U.S. at 257, it did not consider the showing needed to enjoin an *ongoing* unconstitutional proceeding. And since *Collins*, the Court has been unequivocal that "being subjected to unconstitutional agency authority … [before] an unaccountable ALJ … is a here-and-now injury" that "is impossible to remedy once the proceeding is over." *Axon*, 598 U.S. at 191. Various courts have thus held that when plaintiffs seek prospective relief, *Collins* is satisfied simply by showing the here-and-now injury of having to participate in a constitutionally defective administrative process. *See, e.g.*, *Aunt Bertha v. NLRB*, 2024 WL 4202383, at *2 (N.D. Tex. Sept. 16, 2024); *H&R Block*, 2024 WL 3742310, at *2 n.2; *Seton v. NLRB*, 2024 WL 4678057, at *2 (W.D. Tex. Oct. 18, 2024). The same conclusion is warranted here.

## B. The FTC's In-House Adjudication Of Private Rights Violates Article III

Plaintiffs will also likely succeed on their claim that the FTC proceeding violates Article III because it impermissibly seeks to adjudicate administratively claims that the Constitution requires an Article III court to resolve.

33

1.a.     Article III, section 2 of the Constitution provides that the "judicial Power … extend[s] to all Cases, in Law and Equity, arising under th[e] Constitution [or] the Laws of the United States."  Accordingly, as the Supreme Court recently reaffirmed, "[t]he Constitution prohibits Congress from 'withdraw[ing] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, … or in equity, or admiralty.'"  *Jarkesy*, 603 U.S. at 127 (quoting *Murray's Lessee v. Hoboken Land & Improvement Company*, 59 U.S. 272, 284 (1856)).  "[A]n Article III court must decide" such suits.  *Id.*  This requirement reflects that, "'under the basic concept of separation of powers … the judicial Power of the United States' cannot be shared with the other branches."  *Id.* (quoting *Stern v. Marshall*, 564 U.S. 462, 483 (2011)).  By authorizing only Article III courts to exercise the judicial power, the Constitution ensures that neither the executive branch nor the legislative branch is the arbiter of the legality of its own actions and that a "life-tenured, salary-protected Article III judge presides" over matters affecting a person's life, liberty, or property.  *Id.* at 117.

For these reasons, the Supreme Court has "repeatedly explained that matters concerning *private rights* may not be removed from Article III courts."  *Jarkesy*, 603 U.S. at 127 (emphasis added) (citing *Murray's Lessee*, 59 U.S. at 284; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51-52 (1989); and *Stern*, 564 U.S. at 484).  The key question in determining whether a suit concerns private rights "is whether it 'is made of the stuff of the traditional actions at common law tried by the

34

courts at Westminster in 1789.'" *Id.* at 128 (quoting *Stern*, 564 U.S. at 484). "If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory." *Id.*

At the same time, the Supreme Court has "recognized a class of cases concerning … 'public rights'" for which initial adjudication outside Article III courts is permitted. *Jarkesy*, 603 U.S. at 128. "Such matters 'historically could have been determined *exclusively* by [the executive and legislative] branches,' … even when they were 'presented in such form that the judicial power [wa]s capable of acting on them'"—that is, even when the matters were sufficiently definite and concrete to satisfy the case-or-controversy requirement of Article III. *Id.* (emphasis added) (quoting *Murray's Lessee*, 59 U.S. at 284). "In contrast to common law claims, no involvement by an Article III court in the initial adjudication is necessary" in cases involving public rights. *Id.* But the Court has recognized only a handful of matters that fall within this "public rights exception," including those concerning "the collection of revenue," "immigration," "tariffs," "relations with Indian Tribes," "the administration of public lands," and "the granting of public benefits" (such as "payments to veterans," "pensions," and "patent rights"). *Id.* at 128-130. And the Court has emphasized that "[t]he public rights exception is … an *exception*," one that "has no textual basis in the Constitution," such that its invocation must be "evaluated … with care" to avoid the "exception … swallow[ing] the rule." *Id.* at 131. This "close[]" scrutiny is essential so that Article III "serve[s] its purpose" of

35

upholding checks and balances and ensuring "the integrity of judicial decisionmaking." *Id.* at 132.

Applying these principles, the Supreme Court held in *Jarkesy* that statutory causes of action for securities fraud belong in an Article III court. *See* 603 U.S. at 140. The Court explained that what matters for determining whether cases belong in Article III courts or can be adjudicated elsewhere is "the substance of the suit." *Id.* at 133. "'Traditional legal claims' must be decided by courts, 'whether they originate in a newly fashioned regulatory scheme or possess a long line of common-law forebears." *Id.* at 135 (quoting *Granfinanciera*, 492 U.S. at 52).

*Jarkesy* relied on two key indicia in determining that the statutory securities-fraud causes of action there were closely related to "common law [fraud]" and thus "in the nature of" an action at common law. 603 U.S. at 128. *First*, both the statutory and common-law claims "target[ed] the same basic conduct." *Id.* at 125. *Second*, "Congress deliberately used 'fraud' and other common law terms of art" in crafting the statutes. *Id.* "Congress's decision to draw upon common law fraud created an enduring link between federal securities fraud and its common law 'ancestor.'" *Id.* Even though the two causes of action were not "identical," with the statutory claims "narrower" in some respects and "broader" in others than the common-law ones, there was a "close relationship between federal securities fraud and common law fraud." *Id.* at 126.

36

b.    *Jarkesy* compels the conclusion that section 5 claims, like the securities-fraud claims in that case, are "in the nature of … action[s] at common law" and thus seek to adjudicate plaintiffs' private rights—making Article III adjudication "mandatory," 603 U.S. at 128.

*First*, section 5's prohibitions on unfair methods of competition and unfair practices "target the same basic conduct" as common-law claims against unfair competition or anticompetitive or anti-consumer practices. *Jarkesy*, 603 U.S. at 125. Specifically, section 5's bar on unfair methods of competition targets the same conduct that was the focus of common-law suits against anticompetitive behaviors such as "forestalling the market" or "persuading … [persons] to enhance the price" through coercive conduct as well as "monopolies" or "combinations … to raise the price."  4 Blackstone, *Commentaries* *157-159 (1769); *see also A.L.A. Schechter Poultry Corporation v. United States*, 295 U.S. 495, 531-532 (1935).  The same is true of section 5's prohibition on unfair practices, which is conduct that at a minimum "causes or is likely to cause substantial injury to consumers," 15 U.S.C. §45(n).  The common law similarly provided actions against "[c]heating" consumers, selling harmful or defective products, and "[r]egrating," "[e]ngrossing," and related practices that unfairly raised prices for consumers.  4 Blackstone, *Commentaries* *156-159.  This included "every kind of fraud," historically a broad concept at common law and equity.  3 Blackstone, *Commentaries* *431 (1768) (emphasis omitted).

37

Again, *Jarkesy*'s analysis is instructive. Like the object of the SEC action in *Jarkesy*, the object here "is to regulate transactions between private individuals interacting in a pre-existing market." 603 U.S. at 135. The FTC's complaint targets, and seeks to invalidate, thousands of plaintiffs' bargained-for contracts with drug manufacturers and health plan sponsors through an in-house proceeding. *See* FTC Complaint pp.44-45. And contract rights are core "private rights." *Butler v. Pennsylvania*, 51 U.S. 402, 416 (1850); *see also Calder v. Bull*, 3 U.S. 386, 390 (1798) (Chase, J.). Only an Article III court can change these "paradigmatic private rights," *Granfinanciera*, 492 U.S. at 56.

*Second*, Congress made a "decision to draw upon common law" principles of unfair competition and unfair trade practices, thereby "creat[ing] an enduring link" between section 5 and "its common law 'ancestor[s].'" *Jarkesy*, 603 U.S. at 125. Congress intended for the FTC and courts to draw on the "idea of unfair trade at common law" and to apply the "same principles and tests that have been applied under the common law" to new situations. *Sears, Roebuck & Company v. FTC*, 258 F. 307, 310-311 (7th Cir. 1919). The same is true for unfair and deceptive trade practices, "where Congress has []imposed" through section 5 "a structure of federal law upon the existing system of common law remedies for fraud and deceit." *Holloway v. Bristol-Meyers Corporation*, 485 F.2d 986, 989 (D.C. Cir. 1973). Indeed, the FTC has traditionally looked in part to the "common law" to determine if a practice is "unfair." *FTC v. Sperry & Hutchinson Company*, 405 U.S. 233, 244

38

n.5 (1972).  In particular, the commission considers, among other things, "'whether the practice … offends public policy as it has been established by statutes, *the common law*, or otherwise.'"  *Id.* (emphasis added) (quoting FTC, *Statement of Basis and Purpose of Trade Regulation Rule 408*, 29 Fed. Reg. 8325, 8355 (July 2, 1964)).

Just as with the securities-fraud claims in *Jarkesy*, the fact that section 5 claims are not always "identical" to their common-law ancestors poses no barrier to recognizing that their relationship is sufficiently "close" to require Article III adjudication.  *Jarkesy*, 603 U.S. at 126.

c.    The FTC's section 5 claims also fall outside any of the recognized categories of public rights.  They do not concern, for example, "the collection of revenue," "immigration," "tariffs," "relations with Indian Tribes," "the administration of public lands," or "the granting of public benefits," *Jarkesy*, 603 U.S. at 128-130.  Nor do they otherwise constitute claims that "historically could have been determined *exclusively* by [the executive and legislative] branches," *id.* at 128.  Rather, as discussed, the FTC Act is a direct descendant of common-law claims that had to be, and were, adjudicated in common-law courts.  Even if the question were close, the same result would obtain because "[e]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts."  *Id.* at 132.

That the SEC in *Jarkesy* sought civil monetary penalties whereas the FTC here seeks a cease-and-desist order does not lead to a different conclusion.  The fact that

the SEC sought civil monetary penalties (rather than equitable relief) was relevant to *Jarkesy*'s conclusion that the Seventh Amendment required such claims to be tried to a jury. But as *Jarkesy* acknowledged, Congress may not remove private rights from adjudication by Article III courts, regardless of whether the remedies to be imposed are legal or equitable. Whatever the remedy, the section 5 claims the FTC is pursuing against plaintiffs seek to adjudicate private rights for the reasons discussed and thus, under *Jarkesy*, must be brought in an Article III court.

If anything, the fact that the FTC seeks fundamentally equitable remedies here is another reason that Article III adjudication is required. Congress cannot "'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, *or in equity*, or admiralty.'" *Jarkesy*, 603 U.S. at 132 (emphasis added) (quoting *Murray's Lessee*, 59 U.S. at 284). And the broad cease-and-desist order the FTC seeks here is closely analogous to an injunction. *See NLRB v. William Tehel Bottling Company*, 129 F.2d 250, 255 (8th Cir. 1942) (citing *NLRB v. Colten*, 105 F.2d 179, 183 (6th Cir. 1939)); *Globe Cotton Mills v. NLRB*, 103 F.2d 91, 93 (5th Cir. 1939). Indeed, for centuries, courts of equity have adjudicated requests to rescind contracts and enjoin entry into contracts—akin to the FTC's requested remedy of abrogating plaintiffs' private contracts through a cease-and-desist order here. *See Atlantic Delaine Company v. James*, 94 U.S. 207, 214 (1877); 1 Dobbs, *Law of Remedies* §2.6(3) (3d ed. 2018). And suits for equitable remedies against unfair trade practices were commonly brought in courts of equity, just as

40

actions for damages were brought at common law. 3 Blackstone, *Commentaries* *431. Thus, whether viewed in light of the common-law origins of the FTC's claims or the equitable remedies sought, the FTC's proceeding cannot be brought in its administrative tribunal.

2. The district court did not grapple with plaintiffs' arguments about the common-law origins of the FTC's claims, private rights, or the public-rights exception, erroneously concluding (App.327-330; R. Doc. 59 at 5-8) that plaintiffs' Article III claim was foreclosed by *Arkansas Wholesale*. To the contrary, that nearly century-old decision does not speak to plaintiffs' Article III claim.

*Arkansas Wholesale* considered a very specific issue of great relevance at that time: whether Congress could, consistent with due process, provide that FTC "'findings … as to facts, if supported by testimony, shall be conclusive.'" 18 F.2d at 870 (quoting the FTC Act). Before the Administrative Procedure Act applied this standard of review broadly, many courts struggled with this question, and *Arkansas Wholesale* surveyed those decisions before concluding that due process is "satisfie[d]" if a federal court retains "[t]he right of review to determine whether the [FTC's] findings … are based upon substantial evidence." *Id.* at 871. The Supreme Court later agreed. *Crowell v. Benson*, 285 U.S. 22, 65 (1932).

But *Arkansas Wholesale* did not immunize FTC adjudications from all future constitutional challenges, much less the Article III challenge here. Indeed, the phrase "Article III" appears nowhere in the opinion. This Court's conclusion in

41

*Arkansas Wholesale* that the FTC Act's judicial-review provisions are constitutional has no bearing on the antecedent question of which claims (if any) the FTC may bring in-house. That question turns on whether the FTC can, consistent with Article III, administratively declare plaintiffs' private contract rights void and impose a cease-and-desist order based on a cause of action that was historically an action at common law. *Arkansas Wholesale* did not decide those issues. Put simply, this Court's holding that a "specific provision" about deference to reasonable FTC fact-finding was constitutional in 1927 does not bind this Court to conclude that every FTC administrative adjudication is constitutional. 18 F.2d at 870.

### C. The FTC's In-House Adjudication Violates Due Process

Plaintiffs will likely succeed on their claim that the FTC's in-house adjudication of its claims against plaintiffs violates due process.

1.      A "fair trial in a fair tribunal is a basic requirement of due process." *Caperton v. A.T. Massey Coal Company*, 556 U.S. 868, 876 (2009). "No man is allowed to be a judge in his own cause," Federalist No. 10 (Madison), because "when the same person serves as both accuser and adjudicator in a case," an "unconstitutional potential for bias exists," *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016).

That constitutional problem perfectly describes the FTC's in-house adjudicatory system: It "combine[s] the functions of investigator, prosecutor, and judge under one roof." *Axon*, 598 U.S. at 215 (Gorsuch, J., concurring in judgment).

Appellate Case: 25-1383      Page: 57      Date Filed: 04/16/2025 Entry ID: 5506938

FTC commissioners decide what complaints to bring, what factual allegations to make, and what legal claims to assert. 16 C.F.R. §3.11(a). FTC staff then prosecute and try the case in front of an in-house FTC ALJ, in a proceeding governed by "relaxed rules of procedure and evidence—rules [the FTC] make[s] for" itself. *Axon*, 598 U.S. at 215 (Gorsuch, J., concurring in judgment); *see* 16 C.F.R. §§3.1, 3.43, 3.51. And once an ALJ rules, the commissioners then review that ruling *de novo*. 16 C.F.R. §3.54. They thus serve as the agency's last word on the merits of claims they themselves chose to bring.

The constitutional unfairness of having agency officials sit as judges of their own claims is made unmistakably clear by the FTC's win-loss record before itself (particularly compared to its record before neutral Article III arbiters). For the past quarter century, the FTC has found liability in *every* case in which it has ruled on the merits. *See Axon*, 986 F.3d at 1187; Balto, *Can the FTC be a Fair Umpire?*, The Hill (Aug. 14, 2013), https://bit.ly/3UtLIcY; *see* Melamed, *Comments to FTC Workshop Concerning Section 5 of the FTC Act* 14-16 (Oct. 14, 2008), https://bit.ly/4fgunfS. It's a perfect 13-0. *See* App.60-61; R. Doc. 1-1 at 1-2.

By contrast, in court the FTC has experienced numerous losses. Indeed, the FTC lost *every* merger challenge it filed in federal court during the first two years of Chair Khan's tenure. *See, e.g.*, *FTC v. Microsoft Corporation*, 2023 WL 4443412 (N.D. Cal. July 10, 2023) (rejecting the FTC's bid to enjoin a merger) (subsequent history omitted); *FTC v. Meta Platforms, Inc.*, 654 F.Supp.3d 892 (N.D. Cal. 2023)

43

(denying an FTC motion for a preliminary injunction to enjoin a merger). And the FTC has continued to lose in federal court more recently. *See, e.g.*, *FTC v. Tempur Sealy International, Inc.*, 2025 WL 617735, at *54 (S.D. Tex. Feb. 26, 2025) (denying an FTC motion for a preliminary injunction to enjoin a merger); *FTC v. U.S. Anesthesia Partners Inc.*, 2024 WL 2137649 (S.D. Tex. May 13, 2024) (dismissing the FTC's complaint). In short, those who oppose the FTC have a fair chance in court, but the commission's we-judge-ourselves in-house regime means that the "odds [are] stacked against" anyone against whom the FTC brings administrative proceedings. *Jarkesy*, 603 U.S. at 143 (Gorsuch, J., concurring).

2.      The district court held that *Withrow v. Larkin*; *Arkansas Wholesale*; and *Chamber of Commerce of Minneapolis v. FTC*, 280 F. 45 (8th Cir. 1922), bar plaintiffs' due-process claim. App.337; R. Doc. 59 at 12. That is incorrect.

To be sure, *Withrow* provides that "the combination of investigative and adjudicative functions does not, *without more*, constitute a due process violation." 421 U.S. at 58 (emphasis added). But here there is "more": the FTC's perfect in-house win rate over the last quarter-century. The district court did not address this point.

*Chamber of Commerce* and *Arkansas Wholesale*, meanwhile, were both decided before the 1938 and 1970s amendments that dramatically expanded the FTC's power, *see supra* p.23, so those cases did not consider today's FTC with its broader enforcement and adjudicatory authority. And the cases make clear that those

44

changes matter. For example, *Chamber of Commerce* concluded that "there is no denial of due process" when a hearing is granted before the Commission because (1) the court of appeals has "ultimate review"; (2) the FTC "exercises administrative, not judicial, powers"; (3) "[t]he act provides no penalties"; and (4) the FTC does not have "power to make more than findings of facts, which require[] confirmation by th[e] court before any burden is cast upon the parties subjected to inquiry." 280 F. at 48. Today, only one of those four conditions (the first) still holds. *See Seila Law*, 591 U.S. at 218-219; *see also* 15 U.S.C. §45(b), (m); 16 C.F.R. §3.54; *supra* pp.4-5, 23. *Chamber of Commerce* is thus inapplicable to the FTC as it currently operates.

Nor does *Arkansas Wholesale* mean, in 2025, that the "right of review of the findings of the FTC and [of] whether any [cease-and-desist] order it makes 'is responsive to and justified by such findings … satisfies the requirement of due process,'" App.337; R. Doc. 59 at 15 (quoting *Arkansas Wholesale*, 18 F.2d at 871). *Arkansas Wholesale* reached that conclusion in 1927 based on the right of review at that time. But the Commission then was merely "a fact-finding body," *Arkansas Wholesale*, 18 F.2d at 871; appeals were confined to petitions regarding cease-and-desist orders, 15 U.S.C. §§45, 46 (1934); and either party could file for leave to add evidence to the record on appeal, *id.* §45. Now, the FTC exercises near-complete control over the record to enforce a cease-and-desist order. It is no longer required to present its record to the court of appeals to enforce such an order, *see* 15 U.S.C. §45(g) (2018), but instead may seek civil penalties for the violation of an order in

45

federal court through an action that does *not* provide for the supplementation of the record, *see id.* §45(m).

## II. THE DISTRICT COURT ERRED IN CONCLUDING PLAINTIFFS HAVE NOT SHOWN SUFFICIENTLY GREAT IRREPARABLE HARM WARRANTING PRELIMINARY RELIEF

Plaintiffs are suffering and will continue to suffer irreparable harm from being subjected to an ongoing, unconstitutional proceeding administered by an unconstitutionally structured agency. The district court *agreed* that "Plaintiffs may be correct that their injury cannot be fully compensated through … damages," but downplayed this injury as insufficiently "great." App.338; R. Doc. 59 at 16. The latter conclusion was reversible error.

1. "To show irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Morehouse*, 78 F.4th at 1017. Equitable relief is warranted, that is, where "'a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.'" *Grasso Enterprises, LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016). A plaintiff must also show that the alleged "harm is 'not merely a possibility' but is likely to occur absent preliminary injunctive relief." *Morehouse*, 78 F.4th at 1017. "In most instances," this Court has elaborated, "constitutional violations constitute irreparable harm." *Id.* (citing *Powell v. Ryan*, 855 F.3d 899, 904 (8th Cir. 2017) (en banc)).

These principles confirm that plaintiffs have experienced and will continue to experience irreparable harm sufficient to support preliminary relief. The Supreme Court has held that the constitutional violation here, "being subjected to unconstitutional agency authority … [before] an unaccountable ALJ[,] … is a here-and-now injury" that "is *impossible to remedy once the proceeding is over*." *Axon*, 598 U.S. at 191 (emphasis added) (quotation marks omitted). Such harm is, by definition, irreparable. Moreover, the harm plaintiffs face is "not merely a 'possibility.'" *Morehouse*, 78 F.4th at 1017. To the contrary, the constitutional violations are occurring *now* (the government concedes as much as to the Article II violations) and will continue to occur absent relief. While the parties recently received a stay of the FTC proceedings in light of the president's removal of the two Democratic commissioners, *supra* p.8, that stay will expire on July 15, 2025—before this case could realistically reach final judgment. Plaintiffs are therefore likely (if not certain) to continue experiencing irreparable harm without a preliminary injunction.

*Axon* confirms the sufficiency of the irreparable harm here. Faced with similar structural due-process and Article II claims, the Ninth Circuit there stayed the FTC proceeding on the eve of trial to "preserve the status quo" and thus avoid Axon losing the rights it sought to vindicate. *See* Order 2, *Axon Enterprise, Inc. v. FTC*, No. 20-15662 (9th Cir. Oct. 2, 2020), ECF 40. And even after ruling against Axon on jurisdiction, the Ninth Circuit allowed that stay to remain in effect by

47

withholding its mandate pending Axon's petition to the Supreme Court—a choice that implicitly reflects the Ninth Circuit's acknowledgement that Axon's constitutional harms would be irreparable if the Supreme Court determined (as it ultimately did) that federal courts had jurisdiction over Axon's claims. *See id.*, ECF 58. The same irreparable loss of constitutional rights warrants injunctive relief here.

2.a. The district court acknowledged that "*Axon*'s language describing the injury may get Plaintiffs to irreparable harm." App.339; R. Doc. 59 at 17. But the court concluded that "it does not get them to *great* irreparable harm," reasoning that this Court's decision in *Morehouse* supported an arbitrary distinction between constitutional violations that impose "great" harm and those that are somehow less important. *Id. Morehouse* stands for no such proposition. The alleged Second Amendment violation there was held insufficient to establish irreparable harm because the constitutional violation was "speculative," *Morehouse*, 78 F.4th at 1017, not because it was unimportant. The plaintiffs did "not clearly show[] how" a challenged rule "w[ould] prevent them from engaging in constitutionally protected conduct" in the future. *Id.* at 1017-1018. By contrast, the constitutional violations are already indisputably happening here.

b. Nor is there merit to the district court's related suggestion (App.340; R. Doc. 59 at 18 n.8) that, contrary to *Morehouse*, constitutional violations may not typically be irreparable. The out-of-circuit cases the court cited for that proposition do not support it. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290

48

(D.C. Cir. 2006), held that "a party alleging a violation of the Establishment Clause per se satisfies the irreparable injury requirement," *id.* at 304. And in *Delaware State Sportsmen's Association, Inc. v. Delaware Department of Safety & Homeland Security*, 108 F.4th 194 (3d Cir. 2024) (subsequent history omitted), the court held, in a pre-enforcement posture, that plaintiffs had not shown a non-speculative possibility of harm, *id.* at 203. Neither case is inconsistent with plaintiffs' argument that they are suffering ongoing irreparable harm sufficient to warrant preliminary relief.

Even if courts could pick and choose which constitutional violations are sufficiently "great" to support injunctive relief, the constitutional violations here are indeed great. As the Supreme Court has explained, "[t]he structural principles secured by the separation of powers protect the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011). The rights at stake—to be subject only to presidentially accountable executive power, to have one's private rights adjudicated only in an Article III forum, and to require that any governmental process for depriving property or liberty be fair and just—are foundational.

The district court's contrary conclusion (App.338; R. Doc. 59 at 16) rested on *Cigna Corporation v. Bricker*, 103 F.4th 1336 (8th Cir. 2024), and *United States v. Iowa*, 126 F.4th 1334 (8th Cir. 2025). But neither suggests that some real-time constitutional violations are not sufficiently great, because neither case even involved constitutional violations. *Cigna* concluded that the potential disclosure of

49

trade secrets was irreparable and warranted preliminary relief enforcing a non-compete agreement, without stating that the potential harm was sufficiently "great." 103 F.4th at 1346. And *Iowa* found irreparable harm where the enforcement of an Iowa law could strain federal resources for immigration enforcement and damage the United States' relationship with foreign countries. 126 F.4th at 1352. This Court said nothing about the "great[ness]" of these harms, reasoning instead that they were "'more than mere speculation.'" *Id.* at 1352-1353 (quoting *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 951 (8th Cir. 2023)).

Finally, to the extent necessary, plaintiffs preserve the argument that requiring a showing of "great" harm is contrary to Supreme Court precedent and should be rejected.

c. The out-of-circuit cases on which the district court relied (App.338-339; R. Doc. 59 at 17-18) likewise do not support its irreparable-harm ruling. In one, the Tenth Circuit concluded that even "minimal" impacts on artistic expression "tip[ped] … in favor" of a preliminary injunction. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003). In others, the courts held that the plaintiffs had not shown irreparable harm because they had not yet been prejudiced by the removal protections they challenged. *See, e.g.*, *Leachco, Inc. v. Consumer Product Safety Commission*, 103 F.4th 748, 765 (10th Cir. 2024), *cert. denied*, 2025 WL 76435 (U.S. Jan. 13, 2025); *YAPP USA Automobile Systems, Inc. v. NLRB*, 2024 WL 4489598, at *3 (6th Cir. Oct. 13, 2024) (subsequent history omitted). But as

50

discussed, *see* pp.32-33, these decisions are based on the mistaken view that *Collins* requires plaintiffs challenging an ongoing unconstitutional proceeding to show something more than the "'here-and-now injury'" of "being subjected" to such a proceeding, *Axon*, 598 U.S. at 191.

In any event, any effect of *Collins* on the irreparable harm inquiry here is relevant only to the conceded Article II violations, not to irreparable harm from the Article III and due-process violations.

## III. THE DISTRICT COURT ERRED IN CONCLUDING THAT THE BALANCE OF EQUITIES AND PUBLIC INTEREST DISFAVOR PRELIMINARY RELIEF

The merged balance-of-equities and public-interest factor strongly favors a preliminary injunction. Without that relief, plaintiffs will have to continue litigating in a concededly unconstitutional proceeding. The FTC, by contrast, will suffer no meaningful harm from a temporary injunction halting "unlawful agency action," *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). And "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

The district court concluded, however (App.340-343; R. Doc. 59 at 18-21), that the public interest in enforcing the FTC Act outweighs the harm to plaintiffs, reasoning that (1) plaintiffs have not shown a likelihood of success on their constitutional claims, and (2) in any event, plaintiffs' alleged constitutional

violations show no "more than nominal[]" injury (App.342; R. Doc. 59 at 20). As to the first ground, plaintiffs are likely to succeed on their constitutional claims for all the reasons given.

As to the second, it is, with all respect, not a nominal injury to be forced to spend months (if not years) being dragged through a biased and unconstitutional administrative proceeding that threatens plaintiffs' entire business model. While the district court disavowed any intent "to trivialize a constitutional violation," App.341; R. Doc. 59 at 19, it did exactly that—despite recognizing that a "'violation of constitutional rights is never *de minimis*,'" *id.* (quoting *Lewis v. Woods*, 848 F.2d 649, 651 (5th Cir. 1988)). The court's statement that "not every violation of a constitutional right warrants a preliminary injunction," *id.*, misses the point. The question under this factor is whether the harm to plaintiffs from withholding an injunction outweighs any harm to the government and the public from granting one. It unquestionably does. Indeed, as this Court has recognized, "it is always in the public interest to protect constitutional rights," *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020) (per curiam), and this outweighs any countervailing equities on the other side. This merged factor thus supports a preliminary injunction.

## CONCLUSION

The Court should reverse and remand with instructions for the district court to enter a preliminary injunction of the FTC's ongoing administrative proceeding pending a final resolution of this action.

52

April 15, 2025

Respectfully submitted,

/s/ Daniel S. Volchok

ENU MAINIGI
CRAIG D. SINGER
STEVEN M. PYSER
CHARLES L. MCCLOUD
PATRICK DEVER
CHRISTOPHER BALDACCI
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, D.C. 20024
(202) 434-5000

STEVEN A. ENGEL
MICHAEL COWIE
RANI HABASH
DECHERT LLP
1900 K Street N.W.
Washington, D.C. 20006
(202) 261-3481

*Counsel for Caremark Rx, L.L.C.
and Zinc Health Services, LLC*

MATTHEW S. ROZEN
GIBSON, DUNN & CRUTCHER LLP
1700 M Street N.W.
Washington, D.C. 20036
(202) 955-8500

THEODORE J. BOUTROUS JR.
SAMUEL LIVERSIDGE
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7420

*Counsel for OptumRx, Inc.;
OptumRx Holdings, LLC; and
Emisar Pharma Services LLC*

DANIEL S. VOLCHOK
JENNIFER MILICI
PERRY A. LANGE
KEVIN M. LAMB
JOHN W. O'TOOLE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
daniel.volchok@wilmerhale.com

KYLE T. EDWARDS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
(628) 235-1000

CHARLES F. RULE
DANIEL J. HOWLEY
DEREK W. MOORE
RULE GARZA HOWLEY LLP
901 Seventh Street N.W.
Suite 600
Washington, D.C. 20001
(202) 843-9280

*Counsel for Express Scripts, Inc.;
Evernorth Health, Inc.; Ascent Health
Services LLC; and Medco Health
Services, Inc.*

Appellate Case: 25-1383    Page: 68    Date Filed: 04/16/2025 Entry ID: 5506938

## CERTIFICATE OF COMPLIANCE

This document complies with Federal Rule of Appellate Procedure 32(a)(7)(B)(i) in that, according to the word-count feature of the word-processing system used to prepare this document (Microsoft Word Version 2502 Build 16.0.18526.20168), the brief contains 12,590 words, excluding the portions exempted by Rule 32(f), and uses Times New Roman size 14 font.

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK

## CERTIFICATE OF FILING AND SERVICE

On April 15, 2025, the foregoing was filed using the Court's CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system. The brief and addendum have been scanned for viruses using Trellix software, version 5.8.0.161 and is virus free.

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK